IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| **MICHAEL MCELROY, SR.,** *Trustee*; **MICHAEL AND MATTHEW BROTHERS TRUST; FLAT WHOLESALE SUPPLIES; ARCHITECTURAL DESIGN DOORS** | **PLAINTIFFS** |
| V. | CAUSE NO. 3:14-CV-180-CWR-FKB |
| **EVANSTON INSURANCE COMPANY** | **DEFENDANT** |

### ORDER

Before the Court are the defendant's motion to exclude the plaintiffs' expert and its motion for summary judgment. The motions are fully briefed. After considering the arguments, evidence, and applicable law, the motion to exclude will be granted in part and the motion for summary judgment will be granted in full.

**I.     Factual and Procedural History**

Michael McElroy, Sr., is the trustee of the Michael and Matthew Brothers Trust, which owns Flat Wholesale Supplies and Architectural Design Doors. For convenience, all of these parties (who are the plaintiffs) will be referred to collectively as "McElroy."

On March 5, 2011, McElroy's warehouse burned down. He made a claim to Evanston Insurance Company. The warehouse was a total loss and Evanston paid the policy limits of $300,000 for the structural damage. The inventory inside the warehouse – windows, doors, and the like – was also destroyed in the fire, but McElroy and Evanston could not agree on its proper value. McElroy valued the property in excess of the $1.5 million policy limit. Evanston valued it at $471,561.60.

The parties engaged in the appraisal process set forth in the policy. They each named an appraiser with experience in the insurance industry. The appraisers met and worked through the

evidence before them, which consisted of proofs of loss, quotes, photos, and other materials from both McElroy and Evanston. The appraisers reached agreement on a number of issues, then selected an umpire to help them work through their remaining disputes.

At the end of the process, both appraisers and the umpire agreed that the value of McElroy's contents was $496,189.68.

McElroy subsequently filed this suit seeking to overturn the appraisal award. Evanston's motion to dismiss was denied at a hearing, after which the parties engaged in discovery. The present motions followed.

## II.     Legal Standards

### A.     *Daubert*

The admissibility of expert testimony is governed by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and the post-*Daubert* amendments to Federal Rule of Evidence 702. *See Guy v. Crown Equipment Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). That Rule now states that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The purpose of the Rule is to guide the district court's gatekeeping function and ensure that the jury hears reliable and relevant expert testimony. *See Guy*, 394 F.3d at 325. "Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is

scientifically valid. Relevance depends upon whether that reasoning or methodology properly can be applied to the facts in issue." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quotation marks, citations, and brackets omitted); *see United States v. Fields*, 483 F.3d 313, 342 (5th Cir. 2007).

In *Daubert*, the Supreme Court described several non-exclusive factors that trial judges should use to gauge reliability, including whether the proposed technique or theory can be or has been tested, whether it has been subjected to peer review and publication, its error rate, and whether it is generally accepted in the scientific community. *See Guy*, 394 F.3d at 325; *Knight*, 482 F.3d at 351. The Fifth Circuit later clarified that "the reliability analysis must remain flexible: not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy*, 394 F.3d at 325 (citation omitted); *see Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007). The party offering the expert bears the burden of establishing reliability by a preponderance of the evidence. *Moore v. Ashland Chem. Inc*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

"The expert testimony must be relevant, not simply in the sense that all testimony must be relevant, Fed. R. Evid. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 529 (5th Cir. 2015) (quotation marks and citation omitted). It is well-established that courts may inquire into the foundation of an expert's opinion to determine admissibility, since in some cases, "the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion. Expert opinion testimony falls into this category when that testimony would not actually assist the jury

3

in arriving at an intelligent and sound verdict." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) (citation omitted).

The *Daubert* analysis applies to the process of the expert's conclusions, not the merits of those conclusions. *Guy*, 394 F.3d at 325. The merits remain subject to attack at trial by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. "[I]n determining the admissibility of expert testimony, the district court should approach its task with proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quotation marks and citation omitted).

The Fifth Circuit has quoted with approval the Seventh Circuit's observation that "[u]nder the regime of *Daubert* a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Moore*, 151 F.3d at 278 (quotation marks and citation omitted). The extrapolation or "leap[] from an accepted scientific premise to an unsupported one . . . must be reasonable and scientifically valid." *Id.* at 279 (citations omitted).

### B. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence supporting its resolution in favor of the party opposing summary judgment, together with any inferences in such party's favor that the evidence allows, would be sufficient to support a verdict in favor of that party." *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (citation omitted). A fact is material if it "might

affect the outcome of the suit under the governing law." *Id.* (quotation marks and citation omitted).

A party seeking to avoid summary judgment must identify admissible evidence in the record showing a fact dispute. Fed. R. Civ. P. 56(c)(1); *see Tran Enterprises, LLC v. DHL Exp. (USA), Inc.*, 627 F.3d 1004, 1010 (5th Cir. 2010) ("With respect to an issue on which the nonmovant would bear the burden of proof at trial, if the movant for summary judgment correctly points to the absence of evidence supporting the nonmovant with respect to such an issue, the nonmovant, in order to avoid an adverse summary judgment on that issue, must produce sufficient summary judgment evidence to sustain a finding in its favor on the issue.").

The Court views the evidence and draws reasonable inferences in the light most favorable to the nonmovant. *Maddox v. Townsend and Sons, Inc.*, 639 F.3d 214, 216 (5th Cir. 2011). But the Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands, Ltd. v. Wash. Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.), *as revised on denial of reh'g*, 70 F.3d 26 (5th Cir. 1995).

**III.     Discussion**

Because this case is proceeding in diversity, the applicable substantive law is that of the forum state, Mississippi. *Capital City Ins. Co. v. Hurst*, 632 F.3d 898, 902 (5th Cir. 2011). State law is determined by looking to the decisions of the state's highest court. *St. Paul Fire and Marine Ins. Co. v. Convalescent Servs., Inc.*, 193 F.3d 340, 342 (5th Cir. 1999).

In *Munn v. National Fire Insurance Company of Hartford*, the Mississippi Supreme Court held that "an appraisal is presumptively correct, but . . . the court may set aside the appraisal where the award is so grossly inadequate or excessive as to amount to a fraud in effect,

5

although fraud is not charged, or where the appraisers were without authority, or where there is a mistake of fact or to prevent injustice." 115 So. 2d 54, 58 (Miss. 1959) (citations omitted).

McElroy first argues that the $496,189.68 appraisal award is "invalid" because ambiguous language in the insurance policy permits losses to be calculated by either actual cash value or replacement value. Assuming the truth of the argument, the dispute is irrelevant because the parties agree that *in this case* actual cash value and replacement value are identical. McElroy's property was business inventory which had never been put into use, and therefore had never depreciated.

McElroy then contends that the appraisal award is grossly inadequate and would result in an injustice because his appraiser displayed "appalling incompetence" in the appraisal process. She allegedly "incorrectly equated actual cash value . . . with replacement cost valuation." The argument is unsupported by the evidence. The appraiser's testimony shows that she correctly understands the two methods of valuation. *See, e.g.*, Docket No. 57-3, at 17-18, 20, 25, 29-30.

McElroy further contends that his appraiser was unqualified because she is not a licensed public adjuster and allegedly was not permitted to perform appraisals in Mississippi. Again, assuming the truth of the charge for present purposes, it is not clear how this would invalidate the appraisal award under *Munn*. Even if McElroy's appraiser was excluded completely, Evanston's appraiser and the neutral umpire arrived at the same figure as she. And pursuant to the insurance policy and *Munn*, the appraisal award became presumptively correct when it was agreed to by two of the three persons in the appraisal process.[1]

---

[1] McElroy's arguments regarding his appraiser are problematic in other ways, too. Assuming the appraiser erred in some way – which is doubtful in fact, although taken as true for present purposes – why should the insurance company pay a price for her error? McElroy has presented no evidence of collusion to suggest that any fault of the appraiser could be traced back to Evanston's actions.

6

Pressing on, McElroy says that the appraisal award is grossly inadequate because the expert witness he hired for this litigation opines that the appraisal award should have been $1.78 million. The expert reached that sum by taking McElroy's "representation of his inventory," assigning each piece of inventory a retail price (obtained from one of McElroy's competitors), and then "discount[ing] that retail value by 60% to achieve the replacement cost of the inventory." Docket No. 57-1, at 4.

Crediting the validity of this methodology for present purposes, the undersigned is not persuaded that it "properly can be applied to the facts in issue." *Knight*, 482 F.3d at 352. Deposition testimony reveals that "in a number of cases," both McElroy and Evanston's appraisers independently learned that documents McElroy had provided to support his claim were contradicted by their supposed source. Docket No. 57-3, at 14. Specifically, several companies denied speaking with or ever providing quotes to McElroy. *Id.*

In other words, McElroy's documentation was unreliable. And since McElroy's expert admittedly relied upon that documentation as its foundation, the resulting opinion is also unreliable. It does not matter if the expert was unaware of the defects in McElroy's paperwork or not. An expert opinion which is "incomplete in a critical area" can properly be excluded. *Viterbo*, 826 F.2d at 423. And remember, it does not matter the strength of the expert's qualifications, if the scientific principle upon which the opinion is based relies upon a flimsy or faulty foundation, the opinion does not pass *Daubert* scrutiny. *Moore*, 151 F.3d at 278 & n.10.

The issue can be restated in summary judgment terms. Undisputed evidence indicates that "a number of" McElroy's supporting documents were not accurate. McElroy has not submitted any contrary evidence, and McElroy's expert did not conduct his own review; he simply accepted them as true. To establish a dispute of material fact, however, McElroy's expert would

have had to opine that he had evaluated his client's documentary submissions against the standards required in the property appraisal industry, found them sufficient by those standards, and from those documents calculated a loss amount different from the appraisal award. He did not. As it stands, then, his testimony does not assist the jury in determining whether the appraisal award is so grossly inadequate as to amount to a fraud.[2]

Finally, McElroy argues that Evanston was biased against him "from the start" because he is African-American. It is an astonishing assertion since it relies entirely upon a single letter in which Evanston said it would investigate the fire as "potential arson" and look for "any potential illegal trade or contraband that may be related to this loss." That letter, standing alone, does not indicate racial bias.[3]

The standard of review in *Munn* cases is a difficult one. Having reviewed the undisputed, admissible evidence, the Court cannot conclude that the award in this case is so grossly inadequate or excessive as to amount to a fraud in effect, that the appraisers were without authority, that there is a mistake of fact, or that the award should be set aside to prevent injustice.

## IV. Conclusion

The motion to exclude is granted in relevant part, and the motion for summary judgment is granted in full. A separate Final Judgment will issue this day.

**SO ORDERED**, this the 6th day of May, 2016.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

---

[2] McElroy's expert also attempted to confirm his calculation by "assess[ing] this resulting value with the requested value insured and the resulting premiums paid. It was found to be reasonable that the insured would not have bought and paid for insurance on a value that did not correspond to his actual cost of said inventory." The assumption is faulty. A person who wished to commit insurance fraud *would* have bought insurance for a larger amount of property than he actually owned. In this case, Evanston does not argue that McElroy committed fraud.

[3] Just how McElroy leaps to the conclusion that his race has anything to do with the denial of his claim is beyond the pale. He points to no evidence, and there is none. And burying the incendiary charge in the next-to-last paragraph of his argument gives the Court the impression that he merely wanted to incite the Court against Evanston. He failed.